### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

MARK JORDAN,

       Plaintiff,

  v.

       Civil Action No. 20-01478 (CKK)

FEDERAL BUREAU OF PRISONS, *et al.*,

       Defendants.

### MEMORANDUM OPINION

Defendants, Federal Bureau of Prisons' ("BOP") and the BOP Director, have filed a Motion Dismiss, ECF No. 12, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), with a Memorandum in Support ("MTD Mem"), ECF No. 12-1. For reasons explained herein, the Motion will be granted, and this case will be dismissed.

### I.   PROCEDURAL HISTORY

Plaintiff, Mark Jordan, a federal inmate designated to the United States Penitentiary located in Tucson, Arizona, proceeding *in forma pauperis*, filed a *pro se* Complaint ("Compl."), ECF No. 1, on June 1, 2020. He sues the United States Bureau of Prisons ("BOP") and its Director under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.

Defendants were served on September 9, 2020, *see* ECF Nos. 8–9, and on December 21, 2020, they filed the pending Motion to Dismiss in response to the Complaint. Defendants also filed a concomitant Motion for Relief from D.C. Local Civil Rule 7(n)(1), ECF No. 13. More specifically, they requested that the Court waive their requirement to file the administrative record contemporaneous to the filing of their Motion to Dismiss and instead sought to toll the Rule 7(n)(1)

deadline to 60 days subsequent to the filing of an answer to the Complaint, should an answer be necessary after the Court ruled on the dispositive motion. *Id.* at 1–2.

On December 23, 2020, the Court denied Defendants' Motion for Relief. *See* Order, ECF No. 14. The Court agreed that, while the administrative record would be of little value to the Defendants' Rule 12(b)(6) arguments, their Rule 12(b)(1) argument as to Jordan's lack of standing required the submission of the full administrative record, in order to properly assess the issue. *Id.* at 3 (citing *Sierra Club v. EPA*, 292 F.3d 895, 900–01 (D.C. Cir. 2002)).

On February 10, 2021, Defendants timely filed a certified copy of the Administrative Record ("AR"), ECF No. 15.  On April 21, 2020, Jordan filed an Opposition to the Motion to Dismiss ("Opp'n"), ECF No. 20, and a Motion to Supplement the Administrative Record ("MTS"), ECF No. 19, attaching the proposed supplemental documents ("Supp. AR").  On May 25, 2021, Defendants filed a Combined Response to the Opposition and Motion to Supplement ("Reply"),[1] ECF No. 22.[2]  The Motion to Dismiss is now ripe for the Court's consideration.

II.   FACTUAL BACKGROUND

Jordan accepted a guilty plea on March 16, 1995, in the United States District Court for the District of Eastern Pennsylvania, arising from charges of armed bank robbery and using a firearm during a crime of violence. *See United States v. Jordan*, No. 94-cr-00524 (E.D. Pa.) at ECF No.

---

[1]    Jordan's Motion to Supplement seeks leave to append the Administrative Record to include copies of his administrative remedy requests, appeals, and other submissions to BOP in response to his disciplinary proceedings.  *See* MTS ¶ 4.  In their Reply, Defendants contend that they find the additional documents irrelevant, but take no position on Jordan's request to add them to the Administrative Record.  Reply at 11.  Therefore, the Court will grant Jordan's Motion to Supplement and has considered the documents therein.
[2]    An identical duplicate copy of the Reply is also docketed at ECF No. 23.

24.  He was sentenced on October 30, 1995 to serve a 318-month sentence and ordered to pay restitution.  *See id.* at ECF Nos. 29–30.

On June 10, 2004, while serving his sentence, Jordan was criminally charged in the United States District Court for the District of Colorado. *See United States v. Jordan*, No. 04-cr-00229-LTB-1 (D. Colo. 2004).  He was accused of stabbing a fellow inmate to death in the recreational yard at the United States Penitentiary in Florence, Colorado.  *See id.*; *see also United States v. Jordan*, 485 F.3d 1214, 1216 (10th Cir. 2007), *cert. denied*, 552 U.S. 1032 (2007).  On August 9, 2005, after a jury trial, Jordan was convicted of: (1) second degree murder in violation of 18 U.S.C. § 111(a); (2) assault with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1); (3) assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(1), and; (4) assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6).  *See Jordan*, 04-cr-00229-LTB-1 at ECF No. 248; *see also Jordan*, 485 F.3d at 1217.  Treating Jordan as a career offender, he was sentenced to 420 months on Count One, 240 months on Count Two, 120 months on Counts Three and Four (all to be served concurrently), and supervised release.  *See Jordan*, 04-cr-00229-LTB-1 at ECF No. 309; *see also Jordan*, 485 F.3d at 1217–18; Compl. at 1.  The conviction and sentence were upheld on direct appeal. *See Jordan*, 04-cr-00229-LTB-1 at ECF No. 342; *see also Jordan*, 485 F.3d at 1226.  Jordan is currently due to be released on September 23, 2047.  *See* https://www.bop.gov/inmateloc/ at "Mark Jordan" (last visited August 27, 2021).

While incarcerated, Jordan has faced assorted BOP disciplinary charges. On September 21, 2015, Jordan was charged with: (1) introducing prohibited narcotics, (2) using the mail for criminal activity, and (3) using the telephone for criminal activity. Compl. at 4; *see* AR at 5, 14–36.  All of these infractions fall into the "greatest" severity level category. *See* 28 CFR § 541.3 (Table 1). Following an administrative hearing, on March 29, 2016, a Discipline Hearing Officer ("DHO")

3

determined that Jordan committed the charged acts and imposed sanctions for each.  Compl. at 5; *see* AR at 5–8, 37–43; Supp. AR at 1–25.

For introducing narcotics, the DHO imposed sanctions of (1) disallowance of 41 days of good conduct time, (2) 30 days of segregation, (3) 90 days without telephone privileges, (4) 90 days without visitation privileges, and (5) a $50 monetary fine.  Compl. at 5; *see* AR at 5–8, 37–43; Supp. AR at 1–25; 28 CFR § 541.3 (Table 1); Defs.' Ex. 1 (Program Statement 5270.09) ("PS 5270.09") at Ch. 1.  For the mail offense, Jordan received (1) disallowance of 41 days of good conduct time, (2) 30 days of segregation, (3) 90 days without telephone privileges, (4) 90 days without visitation privileges, and (5) a $50 monetary fine. *See id.*  For the telephone offense, Jordan received (1) disallowance of 27 days of good conduct time, (2) 90 days without telephone privileges, (3) 90 days without visitation privileges, and (4) a $30 monetary fine.  *See id.*

According to Jordan, in 2018, he was issued "no less than five (5) incident reports" resulting in the implementation of sanctions by a DHO.  Compl. at 6.  These sanctions were eventually overturned during rehearing or through administrative appeal, but only after he served some or all of those sanctions, including loss of telephone, email, and commissary privileges.  *Id.*; Opp'n at 7; *see* AR at 9–10; PS 5270.09 at Ch. 1.  On July 17, 2019, Jordan was found to have committed the prohibited act of conducting a business without authorization, a "moderate offense," and was sanctioned with a 120-day loss of commissary privileges.  Compl. at 6; *see* AR at 10–12, 44–6; 28 CFR § 541.3 (Table 1); PS 5270.09 at Ch. 1. The sanction as upheld on administrative appeal and Jordan has since served it.  *See* Compl. at 6; AR at 10–12.

In filing this action, Jordan seeks various forms of declaratory and injunctive relief, *see* Compl. at 7–8, but disclaims his intent to challenge his own disciplinary findings or to overturn his penalties, *id.* at 1; *see* Opp'n at 7–8.  Instead, he (1) presents a challenge to BOP's statutory

authority to impose fines and upper monetary limits on disciplinary fines ("caps"), or to impose *any other* penalty, aside from loss of good conduct time credits, Compl. at 6–7 (Claims I, IV) (emphasis added); (2) contends that the disciplinary "fine scale formula contained in Program Statement 5270.09" should have been issued pursuant to notice-and-comment rulemaking, *id.* at 7 (Claim II), and; (3) contends that Program Statement 5270.09 is arbitrary and capricious (Claim III), *id.*

As noted, Defendants move to dismiss pursuant to Federal Rules 12(b)(1) and (b)(6). MTD Mem. at 6–7.  They argue that: (1) BOP has broad authority to establish a system of discipline, *id.* at 8–9; (2) the fine scale formula and its caps constitute statements of agency policy, as well as agency procedures and practices, none of which are subject to notice-and-comment requirements, *id.* at 11–13; (3) the fine scale formula and caps are eminently reasonable on their face, *id.* at 13, and; (4) Jordan lacks standing to challenge the fine caps, because he has allegedly "suffered no injury[,]" *id.* at 9–11.

III.   LEGAL STANDARDS[3]

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216

---

[3]     Jordan cites *Statewide Binding Inc. v. US Dept. Homeland Sec.*, 980 F.3d 109, 114–15 (D.C. Cir. Sept. 16, 2020), *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996) and *Gerber Products Co. v. Perdue*, 254 F. Supp. 3d 74, 83–4 (D.D.C. 2017). Opp'n at 9–10.  He seemingly argues that, so long as a final agency action is identified, an APA claim cannot be dismissed at the pleading stage, but he is mistaken.  Those cases identify the standard for presenting a present a *prima facie* case under the APA, which includes identification of a final agency action. *See Statewide*, 980 F.3d at 114–15; *Transactive*, 91 F.3d at 236; *Gerber*, 254 F. Supp. 3d at 83–4. Those cases, however, neither held that it was the only pleading requirement, nor held that such identification guarantees survival of an otherwise deficient complaint at the pleading stage. *See id.*

F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to a Rule 12(b)(1) motion)).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (Rule 12(b)(6) case); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (Rule 12(b)(1) case).

   A.   Subject Matter Jurisdiction

   Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1173 (2006).  "Federal courts are courts of limited jurisdiction," and the law presumes "that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.' " *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).

   When reviewing a challenge pursuant to Rule 12(b)(1), a court may consider documents outside the pleadings to assure itself that it has jurisdiction.  *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (holding same); *see also Artis*

*v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject-matter jurisdiction.)."  By considering documents outside the pleadings when reviewing a motion to dismiss pursuant to Rule 12(b)(1), a court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment" when documents extraneous to the pleadings are considered by a court.  *Haase*, 835 F.2d at 905.

B.  <u>Failure to State a Claim</u>

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 678–79 (citing *Twombly*, 550 U.S. at 555–56).

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

7

Where the action is brought by a *pro se* plaintiff, a district court has an obligation "to consider his filings as a whole before dismissing a complaint," *Schnitzler v. United States*, 761 F.3d 33, 38 (D.C. Cir. 2014) (citing *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999)), because such complaints are held "to less stringent standards than formal pleadings drafted by lawyers[,]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  In ruling upon a motion to dismiss for failure to state a claim, a court is limited to considering the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which a court may take judicial notice, and matters of public record.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F. 3d 621, 624 (D.C. Cir. 1997); *see also Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 Fed. Appx. 4 (D.C. Cir. 2002) ("[W]here a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.") (citing *Greenberg v. The Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999)).

IV.     DISCUSSION

A.  BOP's Inmate Discipline Program

Congress statutorily and explicitly "granted the Federal Bureau of Prisons broad authority to 'provide for the . . . discipline of all persons charged with or convicted of offenses against the United States.' "  18 U.S.C.  § 4042(a)(3).  Under that authority, BOP established an inmate discipline program ("IDP") to "ensure the safety, security, and orderly operation of correctional facilities, and the protection of the public, by allowing the Bureau staff to impose sanctions on inmates who commit prohibited acts." 28 C.F.R. § 541.1.  Prohibited acts are then grouped into four categories based on severity level – greatest, high, moderate, and low – with multiple options for sanctions of progressive severity at each level.  *Id.* § 541.3.

The prison disciplinary process is initiated by a staff report, submitted by a witnessing staff member.  *Id*. § 541.5(a).  An investigation follows, and a prisoner may participate by providing a statement, requesting witness interviews, and submitting evidence for review.  *Id*. § 541.5(b).  After the conclusion of the investigation, a Unit Discipline Committee determines if the prisoner committed the act and whether the matter should be referred to a DHO for further review. *Id*. § 541.7(a). A prisoner charged with prohibited acts in the "greatest" or "high" severity level is automatically referred to a DHO.  *Id*.  The DHO then conducts a hearing at which the prisoner may appear, *id*. § 541.8(e), and present evidence and witnesses, *id*. § 541.8(f).  If the DHO determines that the prisoner committed a prohibited act, any of the sanctions available in the table of penalties may be imposed.  *Id*. § 541.8(g).

After a notice-and-comment period, on June 20, 2011, BOP added monetary fines as an available disciplinary sanction, with the goal of providing DHOs flexibility to "tailor the discipline of individual inmates[] in a manner best suited to affect behavioral changes." 70 Fed. Reg. 43,093, 43,096 (July 26, 2005) (Proposed Rule); *see also* 75 Fed. Reg. 76,263 (Dec. 8, 2010) (Final Rule); 76 Fed. Reg. 11,078, 11,079 (Mar. 1, 2011) (delaying effective date to June 20, 2011); *see* 28 C.F.R. § 541.3 (Table 1).  A monetary fine may be imposed as a sanction for conduct in any of the four severity levels, however, only by a DHO – and not the Unit Discipline Committee – and after notice and hearing.  *See* 75 Fed. Reg. at 43096; *see also* 28 C.F.R. § 541.3 (Table 1).

In furtherance of these regulations, BOP published Program Statement 5270.09, which sets forth policy guidelines for the IDP.  *See generally* PS 5270.09.  The Program Statement contains upper limits on the monetary fines – or the "caps" – imposed by DHOs for each category of offense severity.  *Id*. at 15 (E).  An offense at the greatest severity level may carry a fine of up to $500, or 75% of the inmate's trust fund balance; a high severity offense may result in a fine of up

to $300, or 50% of the inmate's trust fund balance; moderate severity offenses could bring a fine of $100, or 25% of the inmate's trust fund balance; and low severity offences may be punished with a fine up to $50, or 12.5% of the inmate's trust fund balance. *Id.*

B. BOP's Authority to Impose Disciplinary Sanctions other than Loss of Good Conduct Time (Claims I, IV)

Jordan maintains that "BOP is without authority (statutory or constitutional) to impose monetary fines as sanctions against prisoners for disciplinary rule violations[,]" Compl. at 6, and that it "lacks authority to impose any disciplinary sanction other than that specifically authorized by Congress, the disallowance of good conduct time provided in 18 USC 3624," *id.* at 1. He argues that "under 18 USC 4042(a)(3), the BOP has promulgated disciplinary regulations outlining prohibited acts[.]" *Id.* at 3 (citing 28 CFR 541.1 and 541.3(a) (Table 1)). He states that, because Congress has authorized BOP "to disallow this good conduct time credit as the sanction for prisoner non-compliance with BOP disciplinary regulations[,]" *id.* at 4 (citing 18 USC 3624), BOP has unfairly promulgated its own rules "creating and permitting the imposition of alternate and additional sanctions for prisoner noncompliance with its disciplinary regulations, including the extra-statutory sanctions of disciplinary segregation, monetary restitution, monetary fine, loss of privileges, changed housing, removal from program or group activity, loss of job, impound personal property, confiscation of contraband, restriction to quarters, and extra duty[,] *id.* at 4–5 (citing 28 CFR 541.3(b) (Table 1, Sanctions (C)-(M)); 18 U.S.C. 4042(a)(3)).

Consequently, he demands a declaration stating "that loss of good conduct time credits as specified in 18 USC 3624 is the exclusive permissible sanction that may be

imposed upon prisoners determined to have failed to comply with BOP disciplinary regulations" and deeming "sanctions (C)-(M) of 28 CFR 541.3, Table 1, are in excess of statutory jurisdiction and authority, and contrary to law." *Id*. at 7. He also asks that the Court declare that "BOP is without statutory or inherent constitutional authority to impose monetary fines as sanctions against BOP prisoners for failure to comply with BOP disciplinary rules[,]" thus invalidating 28 CFR 541.3 (Table 1, Sanction (E)). *Id.* And he seeks an injunction estopping BOP from henceforth imposing any sanction other than loss of good conduct time credit. *Id.* at 8.

In support, Jordan argues that BOP has misapplied 18 U.S.C. § 4042(a), which he claims, "merely sets forth the generalized duty owed to inmates by the BOP and does not mention, yet alone authorize, any sanctions whatsoever." Opp'n at 3. He maintains that 18 U.S.C. § 3624(b), which warrants loss of good conduct time credits as a disciplinary measure, is unambiguously the exclusive avenue for addressing any prison disciplinary infraction. *Id*. at 3, 17–18. He argues that BOP's broad interpretation of Section 4042(a)(3), namely, to allow for any other disciplinary measure, is erroneous because Section 4042(a)(3) then ostensibly "swallows [Section 3624(b)] whole" and renders it "utterly superfluous and meaningless[.]" *Id.* a 3–4, 13. And he stresses that BOP has intentionally ignored the "fundamental maxim" that when there exists a more "specific statute" – i.e. Section 3624(b) –it should take " precedence over those of a more general statute" – i.e. Section 4042(a) – "where both statutes speak to the same concerns. " Opp'n at 14 (citing *Union of Concerned Scientists v. Nuclear Reg. Comm'n*, 711 F.2d 370, 381 (D.C. Cir. 1983)).

Jordan acknowledges that Section 4042(a)(3) does, in fact, contain a reference to "discipline[,]" which he takes to mean only the maintenance of "institutional discipline and

good order[,]" but not the imposition of any specific sanctions. *Id.* at 19 (citing *Phillips v. Bureau of Prisons*, 591 F.2d 966, 973–74 (D.C. Cir. 1979)). He contends that Congress has always exclusively "maintained control of the sanctions to be imposed for violations of prison rules." *Id.*

As indicia of this control, Jordan cites to Congress's passage of the Sentencing Reform Act of 1984 and Section 3624(b). *See* Opp'n at 20. He theorizes that when Congress passed the Sentencing Reform Act, and shortly thereafter, authorized Section 3624(b), it "drastically reduced the amount of good conduct time credit federal prisoners could receive to 54 days per year while retaining the BOP's authority to disallow that credit as the permissible sanction where 'the prisoner has not satisfactorily complied with such institutional [disciplinary] regulations.' " *Id.* (citing 18 U.S.C. § 3624(b)). And Jordan argues that Congress, in "reducing the amount of good conduct time a prisoner may receive," and "by abolishing parole[,]"counterbalanced these heightened restrictions by "eliminat[ing] and reduc[ing] the sanctions available to the BOP for such regulatory non-compliance." *Id.* Jordan deduces that BOP then unlawfully created its own regulations by instituting Section 4042(a)(3), as a knee-jerk response to its loss of punitive options. *See id.* at 21. He perceives Section 4042(a)(3)'s authorization of sanctions as "a poor people tax that incentivizes BOP staff to hand out write ups." *Id.* at 16.

In response, Defendants point out that Jordan misunderstands the timeline of the legislative and statutory history. *See* Reply at 4–6. First, BOP's broad disciplinary authority predates its adoption of the "good conduct time" promulgation. *Compare* Pub. L. No. 80-772, 62 Stat. 683, 849 (1948) (establishing the Bureau's disciplinary authority), *with* Sentencing Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. 2, 98 Stat. 1837, 2031 (1984) (adding the language

about good conduct time credit). Second, despite Jordan's contentions, BOP did not establish a range of disciplinary sanctions *only after* Congress passed the Sentencing Reform Act of 1984. *See* Opp'n at 20 (emphasis added).  In actuality, "BOP promulgated regulations articulating a range of possible disciplinary sanctions—including, for example, monetary restitution, loss of privileges, confiscation of contraband, and extra duty—as early as 1982." Reply at 6 (citing 47 Fed. Reg. 35920, 35928–30 (final rule) (Aug. 17, 1982)). And the 1982 regulations "merely codified, with modifications, disciplinary policies and procedures that had previously been 'contained in Policy Statements and Operations Memoranda.' " *Id*. (citing 42 Fed. Reg. 26334, 26334 (proposed rule) (May 23, 1977)).

Thus, Jordan's theory that BOP created its own disciplinary regulations in pugnacious response to the Sentencing Reform Act's elimination and/or restrictions on punishment based on federal parole and good conduct time credits is baseless. Furthermore, even if Jordan's timeline were applicable, it is unclear why Congress's mandates regarding federal parole and good conduct time credits would somehow implicitly prohibit BOP from imposing other forms of discipline, or why Section 3624(b) and Section 4042(a)(3) must operate mutually exclusively.  Importantly, a statute may invalidate another when they "are irreconcilably conflicting[,]" *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698–99 (D.C. Cir. 2014) (quotation marks omitted), but do not, standing alone, invalidate one another if there is some harmless level of overlap, and certainly not where, as here, they are complimentary.  Put differently, Section 3624(b) carries its own specific directives which remain enforceable regardless of Section 4042(a)(3), and it does not limit BOP from imposing a range of other disciplinary measures.

Jordan next argues that BOP is barred from instituting its own punishment system pursuant to 5 U.S.C. § 558(b).  Opp'n at 11.  Section 558(b) provides that a federal agency

may only establish sanctions, rules, and orders that are "within jurisdiction delegated to the agency and as authorized by law." Jordan maintains that BOP's disciplinary sanctions require express statutory authority under Section 558(b) when directed at modifying "primary conduct[,]" Opp'n at 11 (citing *American Bus Ass'n v. Slater*, 231 F.3d 1, 7 (D.C. Cir. 2000)), and he believes that BOP does not have such express authority, *see id.* at 15–16. In support of the same argument, Jordan characterizes Section 4042(a)(3) as a "general statute" that only "provides for a general duty of care" without any "reference [to] a single sanction[,]" Opp'n at 13.

Defendants counter by highlighting BOP's explicit authority to enforce prison disciplinary measures under the same statute. *See* Reply at 3–4 (citing 18 U.S.C. 4042(a)(3)). As already noted, Section 4042(a)(3) plainly vests BOP with authority to "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(3). This language is unequivocal, and therefore, Jordan's argument that BOP lacks authority is circular and ineffectual, for the same reasons already explained.

Jordan's interpretation "ignores the plain language of the provision, which unambiguously authorizes the Bureau to promulgate a system of 'discipline'—not merely some amorphous 'standard of care'—for federal inmates[,]" Reply at 3 (quoting 18 U.S.C. § 4042(a)(3)). It appears that Jordan intends to draw a distinction between the concepts of "discipline" and "sanctions," which is tantamount to form over function. Despite Jordan's objections, it has been long held that BOP should be accorded wide ranging deference in the adoption and execution of policies and practices that in its judgment is necessary to preserve internal order and discipline and to maintain institutional security. *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979). And an agency's

interpretation of its own regulations is "controlling . . . unless it is plainly erroneous or inconsistent

with the regulation." *Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410, 414 (1945).

Jordan also implies that Section 558(b) prohibits BOP from fining a prisoner, unless this

sanction is specifically enumerated Section 4042(a)(3). *See* Opp'n at 13.  However, Section 558(b)

does not articulate this type of global specificity requirement. Jordan relies on *Slater*, 231 F.3d at

3, Opp'n at 11–13, 15, but that case is distinguishable. In *Slater*, the District of Columbia Circuit

found that the United States Department of Transportation ("DOT") failed to comply with Section

558(b) in issuing monetary penalties to bus operators who failed to provide accessible service.  *See

id*. But in *Slater*, the actual statute at issue, 42 U.S.C. § 12188(a)(1), specifically enumerated, in

detail, the exclusive and exhaustive sanctions at DOT's disposal, which did not include monetary

penalties.  *See id*. at 4.  Consequently, the agency had failed to comply because it took actions well

beyond the language of the authorizing statute, not because Section 558(b) mandates this type of

specificity from all agencies their respective statutes and regulations.  Furthermore, BOP, unlike

DOT, *is authorized* by law to use monetary fines as disciplinary measures pursuant to 28 CFR §

541.3 (Table 1).

Finally,  Jordan  takes  personal  umbrage  to  the  application  of  monetary  fines

because, until they are paid in full, they often serve as impediments to a prisoner's access

to other necessities.  *See* Opp'n at 16.  For example, Jordan contends that, until a fine is

paid,  he  is  often  restricted  from  accessing  the  commissary,  receiving  visitors,  or

contacting his family.  *See id*.  He theorizes that, based on the resulting unfairness,

Congress would never have aimed to take money away from prisoners, particularly when

that money is earmarked for a prisoner's needs. *See* Opp'n at 16–17.  In doing so, he cites

to certain provisions of the First Step Act, *see* 18 U.S.C. § 3621(b), and the CARES Act,

*see* Pub. L. 116–136 § 12003(c)(1), 134 Stat 281, 618 (Mar. 27, 2020) [HR 748], both of which established certain accommodations intended to alleviate a prisoner's situational hardships in communicating with, or receiving visits from, their loved ones.  He posits that if Congress approved such measures, they would certainly universally condemn any restrictive measures, like monetary fines, that might hinder these similar objectives.  *See id*.

While the Court is sympathetic to the scenarios presented by Jordan, unless a prisoner is subjected to "extraordinary" treatment, "day-to-day" implementation of various restrictions are "ordinary consequence[s] of confinement for committing a crime." *See Franklin v. District of Columbia*, 163 F.3d 625, 631, 634–35 (D.C. Cir. 1998).  Additionally, he entreats the Court to speculate regarding Congress's unspoken intentions and draw deeply hypothetical connections between disparate statutes, which it cannot do.  Therefore, for all of these reasons, the Court finds that Jordan has failed to state a claim that BOP is want of authority to impose sanctions beyond loss of good conduct credits and Claims I and IV shall be dismissed.

C.  <u>Monetary Fine Caps</u>

i.  <u>Standing</u>

Jordan must plead facts to establish his standing to sue, and "the defect of standing is a defect in subject matter jurisdiction."  *Haase*, 835 F.2d at 906; *see Lujan*, 504 U.S. at 560 (noting that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III").  Federal courts only have subject matter jurisdiction if there is a "Case" or "Controvers[y]" to be decided, U.S. Const. Art. III, § 2, and in the absence of any actual or threatened injury, no such case or controversy exists.  The alleged "injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149–50 (2010)). Further, "generalized grievances . . . shared in substantially equal measure by . . . a large class of citizens . . . does not warrant exercise of jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Defendants first argue that Jordan is want of standing to assert his challenge to the fine caps because the fines he received all fell below the maximum allowable amounts, and therefore, caused him no injury. MTD Mem. at 9–11. The administrative record, and Jordan's own allegations, do indeed reflect that the fines he received fell below the given caps. On March 29, 2016, when Jordan was found guilty of prohibited acts by the DHO**,** each of those acts were classified at the "greatest" severity level. Compl. at 4; *see* AR at 5, 14–36; 28 CFR § 541.3 (Table 1). As a result, Jordan could have received a fine of up to $500, or 75 percent of his trust fund account balance, however, he was only fined $50, respectively, for his charges of introducing narcotics and misuse of the mail, and $30 for his charge of misuse of the telephones. *See id.*; *see also* PS 5270.09 at 15(E). The severity levels of Jordan's 2018 infractions are unclear, but regardless, Jordan's own attestations and the administrative record reflect that he did not receive any fines as sanctions. *See* Compl. at 6; Opp'n at 7; AR at 9–10. And finally, BOP's July 17, 2019 finding that Jordan had engaged in business without authorization, a "moderate" offense, could have resulted in a fine of up to $100 or 25 percent of Jordan's trust fund account balance. *See* Compl. at 6; *see* AR at 10–12, 44–6; 28 CFR § 541.3 (Table 1); PS 5270.09 at 15 (E). Jordan received no fines, instead receiving a loss of commissary privileges. *See* Compl. at 6; AR at 10–12, 44–6; PS 5270.09 at Ch. 1.

The Court finds, however, that Jordan is not only challenging the fine caps, but the "formula" as a whole. *See* Compl. at 1, 4, 6–8; Opp'n at 24–5, 28–34. In other words, he challenges

BOP's overall ability to sanction a prisoner with *any* type of monetary penalty, regardless of the amount. *See id*.  Therefore, because Jordan has been previously fined pursuant to the rubrics of 28 CFR § 541.3 and Program Statement PS 5270.09, albeit well below the maximum amounts, he has nonetheless established standing.

  ii.  APA's Notice & Comment (Claim II)

  Though he has established standing, Jordan fails in his attempt to challenge the fine caps and "formula [] contained in [] BOP Program Statement No. 5270.09, Inmate Discipline Program, Chapter 1, at 15[.]"  Compl. at 4.  The APA generally requires administrative agencies, including the BOP, to provide notice of a proposed rule and a public comment period. *See* 5 U.S.C. § 553.  However, the notice-and-comment period of the APA does not apply to "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 3(b)(A).

  Jordan challenges BOP Program Statement 5270.09 and some of its contents. BOP Program Statements are not commonly subject to the APA's rulemaking provisions and are instead considered statements of internal policy that exempt from notice-and-comment. *See* 5 U.S.C. § 553(b)(A); *Reno v. Koray*, 515 U.S. 50, 61 (1995) (characterizing a BOP Program Statement as an internal agency guideline rather than a published regulation subject to the rigors of the APA, including public notice-and-comment); *see also Phillips v. Hawk*, No. 98-5513, 1999 WL 325487 at *1 (D.C. Cir. Apr. 14, 1999) (per curiam) (holding that all BOP Program Statements are considered internal agency guidelines exempt from the APA, including public notice-and-comment) (relying on *Jacks v. Crabtree*, 114 F.3d 983, 985 n. 1 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 1196 (1998)); *Pelissero v. Thompson*, 170 F.3d 442, 447 (4th Cir. 1999) (holding same); *Royal v. Tombone*, 141 F.3d 596, 600 (5th Cir. 1998) (rejecting prisoner's argument that BOP's

change in policy was invalid because it was not submitted in accordance with the APA, because its guidelines are "promulgated internally and may be altered at will by the BOP"); *Koray v. Sizer*, 21 F.3d 558, 562 (3d Cir. 1994) (holding same), *rev'd on other grounds sub nom Reno*, 515 U.S. at 65; *Rush v. Samuels*, 82 F. Supp. 3d 470, 484 (D.D.C. 2015) (holding that BOP Program Statements are considered internal agency guidelines exempt from the APA, including public notice-and-comment); *Driever v. United States,* No. 19-1807, 2020 WL 6135036 at *9 (D.D.C. Oct. 19, 2020) (holding same); *Brown v. Hogsten*, No. 13-0155, 2015 WL 7450072 at *4 (S.D. W.Va. Oct. 22, 2015) (holding same), *report & recommendation adopted*, No. 13-0155, 2015 WL 7455570 (S.D.W. Va. Nov. 23, 2015); *Ausberry v. Grondolsky*, No. 08-4136, 2008 WL 4225174 at *4 (D.N.J. Sep. 2008) (concluding that BOP's disciplinary guidelines are not subject to the notice-and-comment requirements of the APA because they are internal agency guidelines that may be altered at will).

Moreover, the fine formula and caps themselves constitute an "agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), doubly and independently excluding them from notice-and-comment requirements. An agency may unilaterally adopt, without notice-and-comment, standards of procedure or practice that interpret pre-existing statutes or regulations. *See James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000) (citing *JEM Broad Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994)). If the agency is not substantively amending the language or meaning of the existing regulation itself, the rules are considered "interpretive" or "procedural." *See Reno*, 515 U.S. at 61 (1995); *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). Interpretive or procedural rules, do not themselves shift the rights or interests of the parties, although they may change the way in which parties present themselves to the agency. *JEM Broadcasting Co*., 22 F.3d at 326 (citing

19

*Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)). Therefore, unlike "substantive" or "legislative" rules, interpretive/procedural rules (and general statements of policy) are exempted from the notice-and-comment requirement. *See Reno*, 515 U.S. at 61; *Am. Mining Congress*, 995 F.2d at 1109–12.

Neither the fine caps nor the formula purport to create new law. Instead, as noted by Defendants, "[t]he sanction of a monetary fine and the specific offenses for which it applies are set forth in the Bureau's published regulations, and the program statement changes nothing about those substantive criteria." MTD Mem. at 13.  In other words, the caps and formula are merely borne in furtherance of preexisting statutes, Section 4042(a) and 28 C.F.R. § 541.3, both of which were subject to notice-and-comment, and the latter of which *explicitly allows* BOP to subject prisoners to monetary fines based on any severity of disciplinary infraction.

Additionally, the caps and formula serve to assist DHOs in arriving at an amount for an infraction, but do not create an obligation.  Jordan argues that they create a "binding norm[,]" Opp'n at 28, 31, 33 (citing cases), however, that is plainly inaccurate.  The Program Statement states that a "DHO *may* direct that an inmate pay a fine" pursuant to the formula, but in no way requires the DHO, as a rule, to implement a fine.  PS 5270.09 at 15 (E) (emphasis added). As such, the fine caps and formula provide a point of reference, and a wide-range of options for a DHO, but despite Jordan's insistence, they "ha[ve] no effect on the broad discretionary authority given to the BOP to" implement sanctions at its discretion.  *Kotz v. Lappin*, 515 F. Supp. 2d 143, 150–51 (D.D.C. 2007) (holding that plaintiff could not challenge BOP Program Statement 5330.10 and its contents under the APA because it was an internal agency document containing interpretive rules).  And BOP neither published the fine caps and formula in the Code of Federal Regulations, nor "explicitly invoke its rulemaking authority in" creating them.  *Id.* at 151.  In sum, the fine caps and

formula do not, standing alone, alter a prisoner's substantive rights, which had already been determined by previous authority. *See Am. Mining Congress*, 995 F.2d at 1110 ("the legislative or interpretive status of the agency rules turns not in some general sense on the narrowness or breadth of the statutory (or regulatory) term in question, but on the prior existence or non-existence of legal duties and rights.")

In support of his position, Jordan cites *U.S. Telephone Ass'n v. F.C.C.*, 28 F.3d 1232, 1233–35 (D.C. Cir. 1994).  Opp'n at 33.  In that case, the District of Columbia Circuit assessed a challenge to a penalty schedule promulgated by FCC for assessing monetary fines against licensees for violations of the Communications Act.  *See id*.  The Circuit held that a schedule of fines developed by the FCC was not a policy statement, but rather a rulemaking subject to notice-and-comment requirements.  *See id.* at 1234–36.  However, that case is distinguishable from the circumstances here.  In *Telephone Ass'n,* the FCC followed and employed its penalty schedule severely, identically, and with no discretion, in nearly all of its cases, essentially using it as a means to discriminatorily reprove common carriers.  *See id*.  Instead of serving as guidance, the schedule served as a "rule in masquerade[,]" deceivingly modifying and supplanting the actual statutory authority intended to govern such penalties, *see Telephone Ass'n*, 28 F.3d at 1234–36.

The circumstances here are simply not the same. Program Statement 5270.09 and its fine formula and caps do not change the any of the criteria by which BOP makes substantive decisions regarding discipline, or otherwise.  *See Glickman*, 229 F.3d at 281. For all of these reasons, Program Statement 5270.09, and fine provision therein, are not subject to notice-and-comment rulemaking, and Jordan has failed to state a claim.  Therefore, Claim II will be dismissed.

    iii.  <u>Arbitrary and Capricious (Claim III)</u>

Last, Jordan alleges that Program Statement 5270.09, and the fine caps and formula therein, are arbitrary and capricious.  Compl. at 7.   A reviewing court may set aside an agency action if the agency's action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)); *Douglas v. Independent Living Center of Southern California, Inc*., 565 U.S. 606, 614 (2012) (noting the APA provides for judicial review of final agency action under the standard described in 5 U.S.C. § 706(2)(A)).

However, interpretations of statutes not arrived at by "formal adjudication or notice-and-comment rulemaking," like "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). Policy statements, and their ilk, are nonetheless entitled to a level of respect, to the extent that they have the "power to persuade." *Id.* (quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)); *see also Reno*, 515 U.S. at 61 (observing that a BOP Program Statement is entitled to "some deference" if it represents a permissible construction of the statute).  Here, 18 U.S.C. § 4042 and 28 C.F.R. § 541.3 are entitled substantial deference. Jordan challenges Program Statement 5270.09, and though not subject to the APA, it is entitled to respect to the extent that it has power to persuade.

Program Statement 5270.09 was created to govern the administration of the IDP, to ensure "the safety, security, and orderly operation of correctional facilities, and the protection of the public, by allowing Bureau staff to impose sanctions on inmates who commit prohibited acts."  PS 5270.09 at 1.  The BOP's operation of the IDP, including the fine provision, does not conflict with the Congressional intent that the BOP "provide for the . . . discipline of all persons charged with or convicted of offenses against the United States." Pub. L. No. 80-772, 62 Stat. 683, 849 (1948)

(codified at 18 U.S.C. § 4042(a)(3)).  Under the *Skidmore* framework, the Court thus finds that the BOP's interpretations of Section 4042(a)(3) and Program Statement 5270.09 are plainly permissible constructions of the statute and are in accord with its plain meaning and legislative intent.

In fact, it is not entirely clear what Jordan finds ambiguous or capricious about the Program Statement or the fine caps and formula, apart from a reiteration of his existing arguments.  Though he does not challenge or seek to overturn his own previous penalties, Compl. at 1; *see* Opp'n at 7–8, he contends in his opposition that he was unfairly over-fined in March 2016, because the total fine amount exceeded the balance in his Trust Fund Account, resulting in a negative balance, *see* Opp'n at 26–31.  Jordan seems to suggest that, in situations where a prisoner has a negligible Trust Fund Account balance, a DHO should be prohibited from docking a specific cash amount, and required instead to calculate the fine based only on percentage, and moreover, a reduced percentage.  *See id.*; *see also* PS 5270.09 at 15 (E).  Alternatively, Jordan suggests that a DHO should be limited to "a single fine per incident report, even if there are multiple alleged violations in a single report." *See* Opp'n at 28.

Jordan does not offer any authority in support of this argument, merely remarking that the situations in which a DHO will use a fine amount, versus a percentage, are unclear.  *See id.* at 26–31.  Allowing a DHO some level of discretion, however, is entirely the point, and a DHO's discretion is not equivalent to ambiguity. And eliminating this discretion would be counterintuitive to Jordan's own arguments that a Program Statement should not be a "binding norm." *See id.* at 28, 31, 33.

Notably, Program Statement 5270.09 (Section E), in conjunction with Program Statement 4500.11 (Section 8.8), explicitly allows BOP to "impound" or "encumber" funds as a disciplinary

measure "until the fine is paid."  It would be counterintuitive to tailor a disciplinary measure, or the amount of a fine, as suggested by Jordan, based purely on the balance of a prisoner's trust fund account.  Instead, the amount or percentage must be primarily dictated by the nature, circumstances, and severity of the charge itself.  And as noted by Defendants, the fine amounts imposed on Jordan indeed fell well below the caps. *See* MTD Mem. at 9–11.

Subsequently, the Court finds that Jordan has failed to show that Program Statement 5270.09, and the fine caps and formula, are ambiguous or capricious, and Defendants have demonstrated that BOP's interpretation of those guidelines were both persuasively reasonable and predicated on its own established policy.  Therefore, Jordan has failed to state a claim, and Claim III will be dismissed.

V.    <u>CONCLUSION</u>

For the foregoing reasons, Jordan has failed to state a claim, therefore, the Court GRANTS Defendants' Motion to Dismiss the Complaint, ECF No. 12, pursuant to Federal Rule 12(b)(6).  A separate Order will issue.


DATE: September 13, 2021              _____s/s_____
                                      COLLEEN KOLLAR-KOTELLY
                                      United States District Judge